UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TINA MARIE BIRD,                      )
                                      )
         Plaintiff,                   )
                                      )
              v.                      )      Case No. 3:21-cv-30045-KAR
                                      )
KILOLO KIJAKAZI,[1]                   )
Acting Commissioner of Social         )
Security Administration,              )
                                      )
         Defendant.                   )


MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR AN
ORDER REVERSING THE COMMISSIONER'S DECISION AND DEFENDANT'S MOTION
TO AFFIRM THE COMMISSIONER'S DECISION
(Docket Nos. 22 & 31)

ROBERTSON, U.S.M.J.

I.     INTRODUCTION AND PROCEDURAL HISTORY

       Tina Marie Bird ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) seeking

review of a final decision of the Commissioner denying her application for Social Security

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Plaintiff

applied for DIB and SSI on May 22, 2014 alleging a March 20, 2013 onset of disability due to

carpal tunnel syndrome, asthma, depression, and anxiety (Administrative Record "A.R." at 68-

69).[2]  On May 11, 2016, an Administrative Law Judge ("ALJ") found that Plaintiff was not

---

[1] Pursuant to Fed. R. Civ. P. 25(d), the court directs that Kilolo Kijakazi, Acting
Commissioner of the Social Security Administration ("Commissioner"), be substituted for
Andrew Saul.

[2] All citations to "A.R." refer to the administrative record, which appears on the docket of
this case as document 16. The page numbers were assigned by the SSA and appear in the
lower right-hand corner of each page.

disabled (A.R. at 10-22, 35).  After a session of this court ordered a different ALJ to reconsider the weight assigned to the opinions of two of Plaintiff's treatment providers, the Appeals Council vacated the ALJ's May 11, 2016 decision and ordered another ALJ to offer Plaintiff the opportunity for a hearing, address the additional evidence submitted, take any other action necessary to complete the administrative record, and issue a new decision (A.R. at 873-914, 918).  A second ALJ held a hearing on August 16, 2019 and found that Plaintiff was not disabled from March 20, 2013 through November 22, 2019, the date of the decision (A.R. at 805-23, 831).  The Appeals Council denied review on December 18, 2020 (A.R. at 795-801) and, thus, Plaintiff is entitled to judicial review.

Plaintiff seeks remand based on the contention that the ALJ erred by assigning little weight to the opinions of Plaintiff's mental health treatment providers, Kent S. Hesse, M.D., and Mary A. Lutkus, LICSW.  Before the court are Plaintiff's motion for an order reversing the Commissioner's decision (Dkt. No. 22), and the Commissioner's motion for an order affirming her decision (Dkt. No. 31).  The parties have consented to this court's jurisdiction (Dkt. No. 25).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the reasons set forth below, the court DENIES Plaintiff's motion and ALLOWS the Commissioner's motion.

II.   LEGAL STANDARDS

A.   The Legal Standard for Entitlement to DIB and SSI

In order to qualify for DIB and SSI, a claimant must demonstrate that she is disabled within the meaning of the Social Security Act.  A claimant is disabled for purposes of DIB and SSI if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42

U.S.C. § 1382c(a)(3)(A).  A claimant is unable to engage in any substantial gainful activity when she

> is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated by the Social Security Administration ("SSA").  *See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v),  416.920(a)(4)(i)-(v).  The hearing officer must determine whether: (1) the claimant is engaged in substantial gainful activity; (2) the claimant suffers from a severe impairment; (3) the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) the impairment prevents the claimant from performing previous relevant work; and (5) the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience.  *See id; see also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process).  If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

Before proceeding to steps four and five, the Commissioner must assess the claimant's RFC, which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work.  *See id.*

> RFC is what an individual can still do despite his or her limitations.  RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may

> cause physical or mental limitations or restrictions that may affect his or her
> capacity to do work-related physical and mental activities

Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, including the burden to demonstrate RFC. *See Flaherty v. Astrue*, Civil Action No. 11-11156-TSH, 2013 WL 4784419, at *8-9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). At step five, the Commissioner has the burden of showing the existence of jobs in the national economy that the claimant can perform notwithstanding her restrictions and limitations. *See Goodermote*, 690 F.2d at 7.

B.    Standard of Review

The district court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing. *See* 42 U.S.C. § 405(g). Judicial review is limited to determining "'whether the [ALJ's] final decision is supported by substantial evidence and whether the correct legal standard was used.'" *Coskery v. Berryhill,* 892 F.3d 1, 3 (1st Cir. 2018) (quoting *Seavey v. Barnhart,* 276 F.3d 1, 9 (1st Cir. 2001)). The court reviews questions of law *de novo*, *id.,* but "the ALJ's findings [of fact] shall be conclusive if they are supported by substantial evidence, and must be upheld 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion,' even if the record could also justify a different conclusion." *Applebee v. Berryhill*, 744 F. App'x 6, 6 (1st Cir. 2018) (per curiam) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222-23 (1st Cir. 1981) (citations omitted)). "Substantial-evidence review is more deferential than it might sound to the lay ear: though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not." *Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018) (quoting *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51,

56 (1st Cir. 2003) (internal quotation marks omitted)).  In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence.  *See Applebee,* 744 F. App'x at 6.  That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to experts.  *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

III.     RELEVANT FACTUAL BACKGROUND

A.     Educational Background, Work History, and Daily Living Activities

Plaintiff was forty-seven years old at the time of the second hearing in August 2019 (A.R. at 836).  She had one adult child and lived with her father (A.R. at 836).  She was employed fulfilling orders in the Yankee Candle warehouse for at least ten years until she required surgery on both of her wrists due to her work (A.R. at 39, 41, 289, 840).

Plaintiff's October 2014 function report indicated that she cared for her cat, watched television, shopped, and talked to friends (A.R. at 272, 275).  Plaintiff stated that she could follow spoken instructions quite well and got along with authority figures, but noted difficulty with remembering, concentrating for more than three to five minutes, completing tasks, following written instructions, handling stress and changes in routine, and being around large groups of people (A.R. at 275, 276, 277).

B.     Relevant Medical Records Submitted Prior to the First Hearing

Because Plaintiff's claims of error only relate to limitations arising from mental health impairments, the court limits its review to the mental health treatment records.

1.     ServiceNet

a.     *Kent S. Hesse, M.D.*

Plaintiff began treating with ServiceNet in 2010. She was diagnosed with major depressive disorder, recurrent, moderate, rule out obsessive compulsive disorder and eating disorders NOS, episodic cannabis and alcohol abuse, and generalized anxiety disorder (A.R. at 322). She visited Kent S. Hesse, M.D., of ServiceNet on January 11, 2013 for medication management. Dr. Hesse noted that Plaintiff's grooming and attire were appropriate. She was alert and oriented x 3. She described her mood as mainly stable with a tendency for anxious and depressive feelings at times. She denied acute depression. Her affect was euthymic and mood congruent. Her speech was normal. There was no loosening of association, flight of ideas, or racing, circumstantial, or tangential thoughts. Plaintiff's thought content was free of internal stimuli, hallucinations, delusions, or phobias. She denied suicidal or homicidal ideation or self-destructive impulses. Her short-term and long-term memory were intact notwithstanding some fuzziness at times. Her insight and judgment were good. There was no impulsivity. Dr. Hesse assessed Plaintiff as relatively stable without acute signs or symptoms of mood difficulties. He continued her medications of Lamictal and Zoloft, prescribed Seroquel for anxiety, and discontinued Abilify (A.R. at 323).

During her visit to Dr. Hesse on March 15, 2013, Plaintiff described her mood as anxious at times with slight improvement after she began taking the Seroquel that Dr. Hesse prescribed during her last visit. Plaintiff also reported her struggle with mild to moderate depression that was exacerbated by living with her socially and verbally abusive father. Dr. Hesse noted that Plaintiff's affect was congruent with her mood, her current fund of knowledge and intelligence were within normal limits, and she was a reliable historian. Her mental status was otherwise consistent with her January visit. Plaintiff had no side effects from her medications and would continue taking them (A.R. at 327). On May 17, 2013, Plaintiff reported that her mood was

stable and without agitation, anxiety, depression, or mania.  Her affect was congruent with her mood and euthymic.  She displayed good concentration and attention.  Her mental status exam was otherwise consistent with the results in January and March.  Dr. Hesse noted that Plaintiff's depression was well controlled (A.R. at 329).

On July 19, 2013, Plaintiff reported that she was doing well and the medications stabilized her mood.  Dr. Hesse's objective findings were consistent with Plaintiff's report.  Her mood was unremarkable and without agitation, anxiety, depression, or mania.  Her affect was congruent with her mood.  The results of her mental status examination remained unchanged from the prior visits (A.R. at 339).

On November 15, 2013, Plaintiff told Dr. Hesse that she was helping her aunt move.  Dr. Hesse reported that Plaintiff's mood was without acute agitation, anxiety, depression, or mania but she was struggling with dysphoria and her affect was congruent.  Her mental status examination results were otherwise consistent with her earlier visits.  Dr. Hesse noted good attention and concentration and normal short and long term memory with occasional difficulty recalling names.  Although Plaintiff had stopped taking her medications for two weeks before her visit with Dr. Hesse, she was taking them regularly when she saw him.  He attributed her moderate depression to her cessation of medication for the two week period (A.R. at 343).

Plaintiff had nothing to report about her mood during her next visit to Dr. Hesse on February 14, 2014.  Plaintiff's speech, thought processes and content, and insight and judgment were unremarkable.  Her memory and concentration were grossly normal.  Dr. Hesse noted that Plaintiff's mild to moderate depression was stable (A.R. at 353).  Plaintiff had no complaints about her mood or anxiety during her visits to Dr. Hesse on April 15 and August 22, 2014.  Dr. Hesse noted that her mood was euthymic, her affect was congruent, and her depression was mild

to moderate and stable (A.R. at 357, 574).  During her visit with Dr. Hesse on August 22nd,

Plaintiff indicated that she was seeing her therapist, Mary Lutkus, less often because she had

nothing to talk about and was stable.  She also reported a slight increase in depression.  When

Dr. Hesse suggested using Seroquel during the day, Plaintiff "very adamantly" indicated her

preference for smoking marijuana instead.  She told Dr. Hesse that she regularly smoked

marijuana (A.R. at 574).

       b.      *John Talbot, RNCS*

On February 25, 2015, Plaintiff visited John Talbot, RNCS, of ServiceNet for

medication.  She indicated that she stopped taking all of her medications because they were not

helping and she could not afford them.  On mental status exam, Mr. Talbot noted that Plaintiff

was verbal and cooperative but tearful at times.  She was appropriately dressed.  She denied

suicidal and homicidal ideation.  There was no evidence of psychosis.  She made good eye

contact.  Her speech was clear, with  normal rate and rhythm, and without pressure.  Mr. Talbot

described Plaintiff's mood as depressed and her affect as occasionally tearful.  Her insight and

judgment were fair, at best.  There were no cognitive limitations.  She minimized her alcohol use

and its effect on her.  Mr. Talbot assessed Plaintiff as chronically abusing substances and

prescribed Brintellix (A.R. at 655).

Plaintiff had not started taking the Brintellix before her next visit with Mr. Talbot on

March 18, 2015.  Compared to her visit on February 25th, she was not as tearful, was slightly

less depressed, and had fewer complaints.  Her affect was even and her insight and judgment

were fair.  She had no gross cognitive limitations.  Mr. Talbot recommended that she start taking

the Brintellix that he had prescribed (A.R. at 653).  During her follow-up visit with Mr. Talbot

on April 22, 2015, Plaintiff reported that she still had not taken the medication.  Her mood was

more animated than it was during her March 18th visit and her affect was even. Otherwise her mental status remained the same (A.R. at 651).

        *c.*    *Mary Lutkus, LICSW*

Plaintiff presented the periodic reviews and Psycho Social Wellbeing Quarterly Scales that were completed by her ServiceNet therapist, Mary Lutkus, LICSW. On May 22, 2013, Ms. Lutkus assessed Plaintiff's Global Assessment of Functioning ("GAF") score as 55.[3] The periodic review described Plaintiff's problems as a history of alcohol and marijuana dependence, which resulted in three convictions for operating under the influence and incarceration, and symptoms of anxiety and depression, which included sleep disturbance, irritability, and excessive worry. Ms. Lutkus noted that Plaintiff was in denial concerning the negative impact of her alcohol and marijuana use. Her regular use of marijuana interfered with her relationships and caused financial strain (A.R. at 332-34).

Plaintiff's GAF score was 55 when she visited Ms. Lutkus on December 21, 2013 (A.R. at 346). Ms. Lutkus noted that Plaintiff's anxiety was manifested in some obsessive thinking and compulsive behaviors, overanalyzing and mistrusting others, and constant worrying (A.R. at 349). On June 3 and December 16, 2014, Ms. Lutkus noted Plaintiff's GAF scores of 54 and 52 (A.R. at 358, 663). On December 16th, Ms. Lutkus indicated that Plaintiff's abuse of alcohol and marijuana changed from episodic to regular abuse. Although she drank alcohol once per week, she drank until she blacked out. She used marijuana to relieve her pain and increase her appetite.

---

[3] "A GAF score between 51 and 60 reflects moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See Diagnostic and Statistical Manual of Mental Disorders* 34 (Am. Psych. Assoc., 4th ed., 2000) ("DSM-IV"). The fifth edition of the DSM no longer employs the GAF score, although the Social Security Administration ("SSA") has indicated that it will continue to receive into evidence and consider GAF scores. *See* SSA Administrative Memorandum 13066 (July 22, 2013)." *Blais-Peck v. Colvin,* Civil Action No. 14-cv-30084, 2015 WL 4692456, at *1 n.3 (D. Mass. Aug. 6, 2015).

Ms. Lutkus noted that Plaintiff was spending a great deal of time, money, and energy focusing on alcohol and marijuana.  Her depression and anxiety symptoms remained unchanged (A.R. at 664-67).  The record of Plaintiff's visit to Ms. Lutkus on June 9, 2015 reflects a GAF score of 53 (A.R. at 641).

Ms. Lutkus' November 21, 2015 progress report noted Plaintiff's report of increased alcohol use.  She did not view it as an issue although it had caused legal, financial, housing and relationship problems.  She qualified for a medical marijuana card and continued to smoke marijuana throughout the day to relieve her anxiety symptoms and to help with her sleep and appetite.  Ms. Lutkus noted that Plaintiff's marijuana smoking created conflicts with others (A.R. at 1044).  Ms. Lutkus' January 7 and December 6 2016, progress reports showed no overall change in Plaintiff's conditions (A.R. at 753-58, 1217-20).  On June 15, 2017, Plaintiff attributed her more stable mood to her stable living situation (A.R. at 1216).  The December 17, 2017 progress report again indicated that Plaintiff reported a more stable mood (A.R. at 1212).

Ms. Lutkus completed Psycho Social Wellbeing Quarterly Scales from February 2013 to July 2016.  The clinician was directed to use all available sources of information, including Plaintiff's report, to rate Plaintiff's status in fourteen categories during the past three months as poor (extremely low functioning), impaired (serious problems), marginal (substantial difficulty, but a balance between good and bad days), good, or excellent.  Plaintiff's cognitive functioning was good.  Her emotional functioning was either marginal or impaired.  Her trauma-related symptoms were low or moderate.  Her impulse control, coping skills, immediate social network, extended social relationships, and recreational activities were marginal for the most part.  Ms. Lutkus noted that Plaintiff's material resources (adequacy of food, clothing, shelter, and safety) were impaired.  Plaintiff's alcohol and drug use were moderate at times and high at other times.

Plaintiff's health and independent living skills were either marginal or good.  The scales showed that Plaintiff's work function was marginal for the most part during the three year period.  Plaintiff's past or present legal problems were either good or excellent (A.R. at 336-37, 340-41, 350-51, 354-55, 364-65, 526-27, 637-38, 647-49, 656-58, 659-61, 669-71, 747-49, 750-52, 1046-48).

> d.      *Jamal Hill*

Plaintiff stopped treating with Ms. Lutkus in December 2017.  Jamal Hill conducted an intake assessment of Plaintiff on September 19, 2018 when she sought treatment for anxiety, seasonal depression, and difficulty focusing that impaired her ability to work and to perform activities of daily living.  Plaintiff reported that she drank alcohol once or twice a week and used marijuana every day.  She periodically performed odd jobs.  Mr. Hill diagnosed major depressive disorder, recurrent, moderate, generalized anxiety disorder, specific learning disorder with impairment in reading, severe tobacco use disorder, and alcohol use disorder.  Mr. Hill assessed Plaintiff as being mildly impaired in her friendships and peer relationships, physical health, and eating habits.  Her sleep habits, financial status, and job functioning were moderately impaired.  Mr. Hill assessed a marked impairment in her ability to concentrate (A.R. at 1203-05).  He established a treatment plan to address Plaintiff's symptoms of anxiety and depression (A.R. at 1201, 1208).

> e.      *Louis Velazquez, M.D.*

Plaintiff visited Louis Velazquez, M.D., on December 5, 2018 for a prescription for Adderall which had increased her ability to concentrate in 2003.  Dr. Velazquez noted that Plaintiff was "a poor and unreliable historian."  On mental status evaluation, Plaintiff was alert, fully oriented, and cognitively intact.  She was euthymic with a full range of affect.  She denied

vegetative signs and symptoms, suicidal or homicidal ideation or intent, hallucinations, and

delusions.  Her insight, judgment, and impulse control were good.  There were no indicia of

acute mania, psychosis, or thought disorder.  Dr. Velazquez diagnosed cannabis use disorder,

likely cannabis induced anxiety, amotivational syndrome, and anxiety, history of alcohol use

disorder in sustained remission, tobacco use disorder, rule out social anxiety, and a history of

dyslexia.  Although Dr. Velazquez counseled Plaintiff to seek treatment in order to stop smoking

tobacco and marijuana, Plaintiff was unwilling to consider treatment for her underlying anxiety

or any other psychiatric condition because she disagreed with Dr. Velazquez's differential

diagnosis (A.R. at 1199-1200).

> 2.   Valley Medical Group (PCP)

Plaintiff presented about five years of treatment records from her PCP and other

providers at Valley Medical Group.  On January 13, 2014, Betsy Green, NP, noted Plaintiff's

report that her chronic fatigue, joint and muscle pain, nausea, depression, and anxiety prevented

her from working.  Plaintiff displayed good judgment, was active, alert, and oriented x 3, but was

anxious (A.R. at 388, 389).  On March 20, 2014, Ms. Green noted that Plaintiff was active, alert,

oriented x 3, and depressed (A.R. at 385).  The record of Plaintiff's October 28, 2014 visit with

Ms. Green showed that Plaintiff was active, alert, oriented x 3, and displayed good judgment, but

was anxious (A.R. at 733).

On January 23, April 20, and September 8, 2015, Plaintiff's judgment was good.  On

mental status, she was active, alert, oriented x 3 and displayed a normal mood and affect and

good judgment (A.R. at 718, 724, 726-27).

On March 11, 2016, Plaintiff indicated that she was unable to work because she could not

perform repetitive tasks with her hands or sit or stand comfortably for any length of time.  In

addition, her anxiety was debilitating at times. NP Green observed that she was anxious and depressed, active, alert, and oriented x 3. Plaintiff's judgment was good (A.R. at 1178-79). Plaintiff was active, alert, and oriented x 3 when she saw Margaret Sharron, NP, on March 22, 2016 (A.R. at 1176).

On July 13, 2016, Plaintiff visited Julia McDougal Ronconi, PMHNP-BC, complaining of depression. Plaintiff stated that she was unable to tolerate the side effects of medication and she preferred medical marijuana. She was participating in therapy with Ms. Lutkus at ServiceNet. On mental status examination, Plaintiff was clean, casually dressed and groomed. She was cooperative, calm, responsive, and made good eye contact. Her speech was fluent and clear with normal volume. Her cognition was not impaired, she was oriented to time, place, and person, and her memory was intact. Ms. Ronconi assessed Plaintiff's intelligence as average. Her mood was euthymic and her affect was within normal limits and congruent to thought content. Her insight and judgment were fair. Her thought processes were intact. She denied hallucinating. Ms. Ronconi diagnosed moderate recurrent major depression, rule out PTSD, alcohol dependence, anxiety, rule out substance induced anxiety disorder versus generalized anxiety versus PTSD. Because Plaintiff indicated that she preferred medical marijuana over prescribed medication to control her symptoms, Ms. Ronconi did not understand the reason for Plaintiff's visit but prescribed mirtazapine for depression (A.R. at 1172-75).

Plaintiff was active, alert, and oriented x 3 with good judgment but anxious when she visited NP Green on October 10 and 24, 2016 (A.R. at 1167, 1170). Plaintiff's mood and affect were normal at her December 29, 2016 visit (A.R. at 1160).

Plaintiff was anxious and depressed on January 3, 2017 (A.R. at 1157). Plaintiff reported that she was not taking medication but was stable during her wellness visit on January 23, 2017

(A.R. at 1154).  NP Green noted that Plaintiff was not anxious (A.R. at 1153).  Plaintiff was oriented x 3, but anxious on July 31, 2017 (A.R. at 1149).  Plaintiff reported that she was depressed on August 14, 2017.  A psychiatrist had denied her request for Adderall and she was no longer seeing a psychiatric prescriber.  NP Green explained that Adderall was not used to treat depression.  Plaintiff's mental status was active, alert, and oriented x 3, but anxious (A.R. at 1145-46).  Plaintiff's mental status was normal on December 18, 2017 (A.R. at 1141).  Plaintiff displayed good judgment and was active, alert, and oriented x 3, but depressed on February 15 and March 1, 2018 (A.R. at 1134, 1138).

On July 9, 2018, John O'Sullivan, PT, evaluated Plaintiff for treatment of her right shoulder and arm pain (A.R. at 1124-27).  On July 18th and July 25th, Plaintiff reported that her arm was sore because she was doing more physical work (A.R. at 1120, 1123-24).  On August 8, 2018, Plaintiff indicated that she was doing "a lot of painting" and work that involved reaching above her head (A.R. at 1117).  She reported that she had lifted a generator and worked doing painting and sealing during August 2018 (A.R. at 1107, 1110).  PT O'Sullivan discontinued Plaintiff's PT sessions on September 10, 2018 because Plaintiff's jobs painting and cleaning put continued demands on her shoulder (A.R. at 1104, 1250).  When PT O'Sullivan reevaluated Plaintiff's shoulder on November 12, 2018, she reported that she had completed most of her fall work and had not worked for two weeks (A.R. at 1250).  When Plaintiff visited Jennifer DePiero, M.D., for tobacco use counseling on November 14, 2018, Dr. DePiero noted that Plaintiff was active and alert and her mood and affect were normal (A.R. at 1243, 1246).

Plaintiff's mood and affect were also normal on March 26, 2019 and her depression was stable (A.R. at 1230, 1232).  She was depressed but active, alert, and oriented x 3 during her visit for asthma management on June 11, 2019.  Plaintiff reported that she discontinued therapy

because it was not helpful.  She expressed an interest in resuming therapy and medication (A.R. at 1226-27).

On August 14, 2019, Plaintiff visited Stephen Gallant, M.D., for a psychopharmacologic consultation.  Plaintiff reported that she was able to enjoy activities and felt safe in her relationship but her depressive symptoms and difficulty concentrating were not responding to marijuana.  On the mental status examination, Plaintiff was well groomed and clean.  She was cooperative, calm, responsive, and made eye contact.  Her speech was fluent and clear with normal volume.  Her cognition was unimpaired, she was oriented to time, place, and person, and her memory was intact.  Dr. Gallant assessed her intelligence as average.  Her mood was sad and dysthymic, although Dr. Gallant noted that Plaintiff was outwardly euthymic.  Her affect was within normal limits and congruent to thought content.  Her insight and judgment were good.  Her thought processes were intact and her thought content was unremarkable.  He prescribed desvenlafaxine (Pristiq) to treat her depression (A.R. at 1265-69).

On September 3, 2019, Plaintiff visited NP Green for asthma management.  Her mood and affect were normal.  She was active, alert, oriented x 3, and displayed good judgment.  Plaintiff was not taking the medication that Dr. Gallant prescribed because she did not think that it was covered by her insurance.  She indicated that she would work on getting effective medication that her insurance would cover during her follow-up appointment with Dr. Gallant on September 17th (A.R. at 1260, 1263-64).

     C.    <u>Opinions</u>

          1.    ServiceNet Treatment Providers

          *a.*    *October 15, 2014, Kent S. Hesse, M.D. and Mary A. Lutkus, LICSW*

Dr. Hesse and Ms. Lutkus of ServiceNet completed a Psychiatric Disorder form on October 15, 2014.  They diagnosed Plaintiff with major depression, alcohol and cannabis abuse, generalized anxiety, and dyslexia and assessed a GAF score of 54.  Plaintiff was able to live on her own.  As to Plaintiff's ability to concentrate, the assessments were based on Plaintiff's reports that she had difficulty focusing, was easily distracted, and was often consumed with internal thoughts and worries.  As to her ability to remember work-like tasks and instructions, Dr. Hesse and Ms. Lutkus indicated that Plaintiff reported a poor memory.  As to Plaintiff's ability to interact appropriately with others, the treatment providers stated that criticism might trigger her anger and she might have difficulty asking for help.  Her mood swings tended to push others away and precipitate arguments.  As to her ability to adapt to change, Dr. Hesse and Ms. Lutkus stated that change made Plaintiff anxious and irritable.  At that time, she was treated by individual therapy once or twice per month and quarterly medication management appointments.  She was prescribed Lamictal, Zoloft, and Seroquel.  The treatment providers opined that because Plaintiff's depression and anxiety symptoms had persisted since she began therapy in 2010, her current status might be her baseline (A.R. at 245-48).

> b.    *April 22, 2015, Mary A. Lutkus, LICSW*

On April 22, 2015, Ms. Lutkus wrote a letter at Plaintiff's request.  Ms. Lutkus indicated that Plaintiff's diagnosis of major depressive disorder was based on her observations and assessments of the following symptoms:  Plaintiff's depressed and irritable mood; tearful affect; suicidal ideation at times of extreme stress; tendency to isolate; poor memory, focus and concentration; sense of hopelessness, helplessness, and worthlessness; interpersonal difficulties; poor ADLs at times; and sleep and appetite disturbances.  The diagnosis of general anxiety disorder was based on Plaintiff's anxious mood and affect; intrusive worries that could negatively

16

impact her interpersonal interactions; pressured speech; and psychomotor agitation.  Plaintiff described her thoughts and worries as taking on a "somewhat obsessive-compulsive quality" (A.R. at 588).

    *c.*  *March 23, 2016, Mary A. Lutkus, LICSW*

   Ms. Lutkus completed a Mental Impairment Questionnaire on March 23, 2016.  Ms. Lutkus described Plaintiff as having a depressed and anxious mood, irritable affect, pressured speech, tendency to isolate, difficulty with communication, and passive suicidal ideation.  She noted that Plaintiff was not able to tolerate prescribed medication and expected Plaintiff's chronic symptoms to persist.

   Ms. Lutkus checked boxes describing a plethora of Plaintiff's signs and symptoms.  Insofar as is relevant here, she indicated that Plaintiff exhibited anhedonia, appetite disturbance with weight change, decreased energy, feelings of guilt or worthlessness, impaired impulse control, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, persistent disturbance of mood or affect, paranoid thinking, recurrent obsessions or compulsions which were a source of marked distress, substance dependence, intense and unstable personal relationships and impulsive and damaging behavior, emotional lability, flight of ideas, pressured speech, and memory impairment.  Plaintiff did not have a low IQ or reduced intellectual functioning.

   Ms. Lutkus opined that Plaintiff had a moderate restriction of activities of daily living and marked difficulties in maintaining social functioning and maintaining concentration, persistence, or pace.  Ms. Lutkus further opined that, during a twelve month period, Plaintiff would have one or two episodes of decompensation (loss of adaptive functioning) lasting at least

two weeks.  According to Ms. Lutkus, Plaintiff's impairments or treatment would cause her to be absent from work more than four days per month (A.R. at 788-91).

     2.     State Agency Assessments

     *a.*     *DIB and SSI - Initial*

On August 7, 2014, Ginette Langer, Ph.D., completed a disability assessment of Plaintiff's mental health impairments for purposes of her DIB and SSI claims (A.R. at 73, 83). Based on the record, Dr. Langer concluded that Plaintiff's learning disorders, borderline intellectual functioning, drug and substance abuse disorders were severe and her affective and anxiety disorders were nonsevere (A.R. at 72, 82).  In her opinion, those conditions caused a mild impairment of Plaintiff's activities of daily living; mild difficulties in maintaining social functioning; and a moderate impairment in her ability to concentrate, persist, or maintain pace (A.R. at 73, 83).  Dr. Langer opined that Plaintiff did not have any episodes of decompensation, each of extended duration (A.R. at 73, 83).  In the mental residual functional capacity assessment, Dr. Langer found that Plaintiff had understanding and memory limitations (A.R. at 74, 84).  Dr. Langer opined that Plaintiff could understand and remember simple instructions but would have difficulty retaining information for complex instructions (A.R. at 74-75, 84-85).  Dr. Langer found that Plaintiff was moderately limited in her ability to carry out detailed instructions and to maintain attention and concentration for extended periods (A.R. at 74-75, 84-85). Although Plaintiff had moderate limitations in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace, she was able to sustain focus and pace for simple tasks for two-hour periods during an eight-hour day in a forty hour workweek (A.R. at 75, 85).  Dr. Langer further opined

that Plaintiff had no limitations in her abilities to socially interact and adapt (A.R. at 75, 85).  Dr.

Langer concluded that Plaintiff was not disabled (A.R. at 76-77, 86-87).

              *b.*       *DIB and SSI – Reconsideration*

On  December 29, 2014, on reconsideration, Orrin Blaisdell, Ph.D., agreed with Dr.

Langer's assessment of Plaintiff's severe and nonsevere mental disorders and the degree of the

restrictions that were related to those disorders (A.R. at 97-98, 110-11).  Dr. Blaisdell agreed

with Dr. Langer's mental residual functional capacity assessment in all areas except one (A.R. at

99-100, 112-13).  Unlike Dr. Langer, who found no limitations in Plaintiff's ability to perform

activities within a schedule, maintain regular attendance, and be punctual, Dr. Blaisdell found

that Plaintiff had moderate limitations in those areas because she had missed some appointments

(A.R. at 100, 113).  Notwithstanding that difference, like Dr. Langer, Dr. Blaisdell opined that

Plaintiff could concentrate, sustain attention, and keep pace for simple tasks for two hour spans

during an eight-hour day in a forty-hour workweek (A.R. at 100, 113).  Dr. Blaisdell agreed with

Dr. Langer's assessment that Plaintiff was not disabled (A.R. at 101-02, 114-15).

          D.       <u>The Testimony at the First Hearing on April 18, 2016</u>

Plaintiff testified that her depression and anxiety prevented her from working (A.R. at

42).  She attributed her mental condition to the loss of her mother in 2007 and the loss of her job

in 2010 (A.R. at 43).  Plaintiff had stopped taking psychiatric medication about three months

before the hearing because it was not working (A.R. at 46).  Her therapy sessions helped (A.R. at

58).  On an average day, Plaintiff watched television, washed the dishes and swept the floor,

went outside, and cooked dinner (A.R. at 48, 49).  She could focus on television programs that

lasted thirty minutes (A.R. at 54).  She avoided crowds because they made her anxious (A.R. at

49, 61).  She focused on getting what she needed when she shopped (A.R. at 61).  She described

her memory lapses during conversations (A.R. at 60).  She kept a calendar to remember her

appointments (A.R. at 60-61).

     E.    <u>The First ALJ's Unfavorable Decision</u>

On May 11, 2016, the first ALJ found that Plaintiff had the following severe

impairments:  major depressive disorder, polysubstance abuse, asthma, and carpal tunnel

syndrome (A.R. at 13).  Plaintiff did not have an impairment or combination of impairments that

met or medically equaled the severity of a listed impairment (A.R. at 13).  As to Plaintiff's

mental impairments, the ALJ found that Plaintiff had mild restrictions in her activities of daily

living, mild difficulties in social functioning, and moderate difficulty maintaining concentration,

persistence, and pace (A.R. at 13-14).  She had not experienced any episodes of decompensation

of extended duration (A.R. at 14).  The ALJ found that Plaintiff had the RFC to perform simple,

routine tasks, understand, remember, and carry out simple instructions, make simple work-

related decisions, and tolerate few changes in the work setting (A.R. at 14).  In crafting the RFC,

the ALJ gave Dr. Langer's and Dr. Blaisdell's opinions great weight (A.R. at 18).  He assigned

partial weight to Ms. Lutkus' April 22, 2015 opinion and the least weight to her March 23, 2016

opinion (A.R. at 19, 20).

     F.    <u>The Testimony at the Second Hearing on August 16, 2019</u>

The second ALJ held a hearing on August 16, 2019 (A.R. at 831).  Plaintiff testified that

she could read and write in English (A.R. at 836).  She did not have a driver's license because

she had three convictions for operating under the influence of alcohol (A.R. at 837).  She

testified that she had been sober since 2010 (A.R. at 838).

Plaintiff indicated that she suffered from the symptoms of depression and anxiety (A.R.

at 846).  She had seen a therapist for ten years until 2017.  In response to the ALJ's inquiry as to

why Plaintiff stopped treatment with the therapist, Plaintiff responded that she was "okay in that department right now" (A.R. at 847).  She did not suffer side effects from her medication that was prescribed by a psychiatrist at Valley Medical, but did not think it was relieving her symptoms (A.R. at 847, 849, 858-60).  She described her symptoms of obsessive compulsive disorder as needing everything in the refrigerator and the kitchen cabinets to be in a certain place or arranged in a specific order (A.R. at 861).  She had difficulty concentrating on conversations (A.R. at 861).  She used lists and a calendar as memory aids (A.R. at 861-62).

On a typical day, Plaintiff prepared her meals, washed the dishes, did some cleaning, watched television, and went outside (A.R. at 850).  She wanted to stay in bed on some days (A.R. at 847).  Her physical impairments prevented her from doing much gardening (A.R. at 850).  She avoided crowded places (A.R. at 847, 860).

The ALJ asked the Vocational Expert ("VE") to assume a hypothetical individual of Plaintiff's age, education, and work experience who was limited to performing sedentary work that was simple and routine in nature, that required no more than occasional (up to one-third of the workday) coworker or public contact, and did not require detailed reading (A.R. at 864-65). The VE testified that the hypothetical individual could not perform Plaintiff's past work, but could perform the unskilled jobs of polisher, DOT 713.684-038, with about 15,000 jobs in the national economy; labeler, DOT 017.684-010, with approximately 20,000 jobs in the national economy; and sedentary inspector, DOT 669.687-014, with 20,000 jobs in the national economy (A.R. at 865-66).  The VE opined that there would be no work available for an individual who was off-task during at least twenty-five percent of the workday due to chronic pain and psychiatric symptoms or who was absent from work more than four days per month (A.R. at 866-67).

G.      The Second ALJ's Decision

The second ALJ conducted the requisite five-step sequential analysis.  He found that Plaintiff's date last insured was June 30, 2014 and that, although Plaintiff had worked, she had not engaged in substantial gainful activity after the alleged onset date of March 20, 2013 (A.R. at 807).  At the second step, he found that Plaintiff's severe impairments included major depressive disorder, dyslexia, and generalized anxiety disorder (A.R. at 808).  Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment (A.R. at 809).  As to the so-called Paragraph B criteria, the ALJ found that Plaintiff had a mild limitation in her ability to understand, remember, or apply information; a moderate limitation in interacting with others; a moderate limitation in her ability to concentrate, persist, or maintain pace; and a mild limitation in adapting or managing herself (A.R. at 810).

The ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record (A.R. at 813).  The ALJ found that Plaintiff had the RFC to perform sedentary work except that she was limited to work that was simple and routine in nature, required only occasional coworker or public contact, and did not require detailed reading (A.R. at 811).  The ALJ determined that Plaintiff was unable to perform her past relevant work, but could perform the unskilled jobs of polisher, labeler, and inspector identified by the VE and, therefore, was not disabled from March 20, 2013 through November 22, 2019, the date of the decision (A.R. at 821-23).

IV.     ANALYSIS

Plaintiff contends that the ALJ erred by failing to provide a legally sufficient rationale for affording little weight to the three opinions of her treating mental health clinicians, Dr. Hesse and Ms. Lutkus (Dkt. No. 23 at 8-14). The Commissioner counters that the ALJ sufficiently explained his reasons for assigning the opinions little weight and his decision was supported by substantial evidence (Dkt. No. 32). The Commissioner's position is persuasive.

An ALJ is required to consider the medical opinions in the case record. *See* 20 C.F.R. §§ 404.1527(b), 416.927(b). For applications filed before March 27, 2017, medical opinions are "statements from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including . . . symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and . . . physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1).[4] "Acceptable medical sources" included licensed physicians and licensed or certified psychologists. 20 C.F.R. §§ 404.1513(a)(1), (2) (2016), 416.913(a)(1), (2) (2016). Therapists and licensed social workers were excluded from the regulatory definitions of "acceptable medical sources." *See Taylor v. Astrue,* 899 F. Supp. 2d 83, 88 (D. Mass. 2012) (licensed social workers are not acceptable medical sources) (citing SSR 06-3p, 2006 WL 2329939, at *3 (Aug. 9, 2006)); *Cruz v. Astrue,* Civil Action No. 11-40054-FDS, 2012 WL 220535, at *7 (D. Mass. Jan. 24, 2012) ("A clinician is not an acceptable medical source and is treated as another source of evidence."); 20 C.F.R. §§ 404.1513(d) (2016), 416.913(d) (2016).

---

[4] For applications filed on or after March 27, 2017, the SSA regulations altered the standards by which adjudicators are directed to assess medical opinion evidence. The change in regulations did away with the long-standing rule that opinion evidence from an acceptable source was entitled to controlling weight. *See, e.g., Richardson v. Saul*, 565 F. Supp. 3d 154, 166-67 (D.N.H. 2021) (citing *Nicole C. v. Saul*, C.A. No. 19-127JJM, 2020 WL 57727, at *4 (D.R.I. Jan. 6, 2020)) (citing 20 C.F.R. § 404.1520c(a)). Plaintiff applied for DIB and SSI on May 22, 2014. The new regulations do not apply to this case.

A "treating source" is an acceptable medical source who provided the claimant with medical treatment and who had an ongoing relationship with her.  *See* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).  "An administrative law judge must give controlling weight to the opinion of a 'treating source' when that opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with substantial evidence in the record."  *Taylor,* 899 F. Supp. 2d at 87.  *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  However, "[t]he law in this circuit does not require ALJs to give greater weight to the opinions of treating physicians [or psychiatrists]."  *Arroyo v. Sec'y of Health & Human Servs.*, 932 F.2d 82, 89 (1st Cir. 1991).  *See Andrews v. Kijakazi,* CIVIL ACTION NO. 18-40069-TSH, 2022 WL 867803, at *4 (D. Mass. Mar. 23, 2022).  When an ALJ does not adopt a treating source's opinion, "he . . . must consider the length, nature, and extent of the treatment relationship, the opinion's supportability and consistency with the record as a whole, the treating source's area of specialization, and any other relevant factors to determine the weight the opinion deserves."  *Taylor,* 899 F. Supp. 2d at 87.  *See* 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).  "[T]he regulations require the ALJ to explain the weight given to a treating source opinion and the [specific] reasons supporting that decision."  *Perry v. Colvin*, 91 F. Supp. 3d 139, 152 (D. Mass. 2015) (citing 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996)).  As to the opinions from medical care providers who are not acceptable medical sources, the ALJ is required to apply the same factors used to weigh the acceptable medical source opinions and to explain the weight assigned to the opinions in a way that permits the claimant and the subsequent reviewer to follow the ALJ's reasoning.  *See* 20 C.F.R. §§ 404.1527(f), 416.927(f).

    A.    <u>Dr. Hesse's opinion on the Psychiatric Questionnaire was not entitled to controlling weight</u>.

Although as Plaintiff's treating psychologist, Dr. Hesse was an acceptable medical source and, therefore, was a treating source, the ALJ permissibly accorded little weight to his October 15, 2014 opinion concerning the severity and permanence of Plaintiff's mental health impairments because Dr. Hesse's opinion was neither "'well-supported' by 'medically acceptable' clinical and laboratory diagnostic techniques" nor consistent with "the other 'substantial evidence' in the [case] record" (A.R. at 548-49).  SSR 96-2p, 1996 WL 374188, at *2.  The ALJ could discount Dr. Hesse's opinion because it relied on Plaintiff's subjective reports of her impaired memory, concentration, and attention instead of the contrary objective evidence that Dr. Hesse's examinations revealed (A.R. at 545-48, 817-18).  *See Patoski v. Berryhill,* 320 F. Supp. 3d 283, 293 (D. Mass. 2018), *aff'd,* No. 18-1904, 2019 WL 2574591 (1st Cir. June 24, 2019) ("The ALJ can discount a medical opinion when it is not corroborated by adequate supporting explanations or laboratory findings."); *Maillet v. Colvin,* Civil Action No. 15-13365-MGM, 2016 WL 3676142, at *5 (D. Mass. July 7, 2016) (the ALJ permissibly rejected an opinion that was based on Plaintiff's subjective reports); *Simumba v. Colvin,* Civil Action No. 12-30180-DJC, 2014 WL 1032609, at *9 (D. Mass. Mar. 17, 2014) (the clinician's reliance on the plaintiff's self-reported symptoms was a sufficient reason for the ALJ to discount his opinion).

The record supported the ALJ's explanation that, with the exception of Dr. Hesse's opinion that Plaintiff's anxiety would limit her social functioning, which the ALJ accepted and included in the RFC, the balance of Dr. Hesse's opinion was inconsistent with the objective evidence in his own treatment records and with other substantial evidence in the record including the state agency examiners' opinions, Plaintiff's GAF scores, and the evidence showing that Plaintiff's mental health improved over time (A.R. at 547, 811, 817-18, 820, 821).  *See Shields v.*

*Astrue,* Civil Action No. 10-10234-JGD, 2011 WL 1233105, at *8 (D. Mass. Mar. 30, 2011) ("Because the ALJ supported his rejection of the treating physician's opinions with express references to specific inconsistencies between the opinions and the record, the ALJ's decision not to grant [the treating physician's] opinions significant probative weight was not improper."). The ALJ noted that Dr. Hesse's opinion that Plaintiff had difficulty remembering and focusing was inconsistent with his objective assessments of her condition during her visits (A.R. at 545, 548, 821). Dr. Hesse's examinations showed that Plaintiff's short-term and long-term memory were intact. She displayed good attention, concentration, insight, and judgment. She had no gross cognitive limitations. Her thought content was free of internal stimuli, hallucinations, delusions, phobias, obsessions, and compulsions. She denied suicidal or homicidal ideation and self-destructive impulses. Dr. Hesse described Plaintiff's condition as stable for the most part (A.R. at 323, 327, 329, 339, 343, 353, 357, 574, 815-18, 821). *See Purdy,* 887 F.3d at 13-14 (where a treatment provider's own records were at odds with his opinion, the ALJ did not err in refusing to treat the opinion as controlling or in giving it little weight); SSR 96-2p, 1996 WL 374188, at *3.

The ALJ adopted the state agency examiners' opinions that Plaintiff had the capacity to understand, remember, and carry out simple instructions (A.R. at 74-75, 84-85, 99-100, 112-113, 820) and gave significant weight to Plaintiff's GAF scores (50-55) that were consistent with the consultants' assessments of moderate limitations in those functional areas and were inconsistent with Dr. Hesse's opinion (A.R. at 815). *See Blais-Peck,* 2015 WL 4692456, at *1 n.3; *see also Patoski*, 320 F. Supp. 3d at 290 ("Although GAF scores are not determinative, it is appropriate for the ALJ to consider an individual's GAF score when assessing functional ability.").

In contrast to Dr. Hesse's October 2014 prognosis that Plaintiff's condition was static (A.R. at 547), the following records showed that Plaintiff's condition improved over time (A.R.

at 817-18):  Plaintiff's August 22, 2014 report to Dr. Hesse that her visits with her therapist were less frequent because she had nothing to discuss and her condition was stable (A.R. at 574); Mr. Talbot's March and April 2015 treatment records that showed improvement since her February visit (A.R. at 651, 653, 817-18); Ms. Ronconi's July 2016 record showing that Plaintiff's mood was euthymic, her affect was within normal limits, her cognition was unimpaired, and her memory was intact (A.R. at 1172-75); Dr. Velazquez's December 2018 treatment record showing that Plaintiff was euthymic with a full range of affect, was cognitively intact, had good insight, judgment, and impulse control, and displayed no indicia of a thought disorder (A.R. at 1199-1200); and Dr. Gallant's August 2019 treatment record showing that Plaintiff displayed an outwardly euthymic mood, normal affect, unimpaired cognition, an intact memory, average intelligence, good insight and judgment, intact thought processes, and unremarkable thought content (A.R. at 1268-69).[5]  In addition, Plaintiff worked part-time doing painting and cleaning in 2018 and she testified at the second hearing in 2019 that although she had difficulty focusing on conversations, she was able to watch television.  She further testified that she no longer needed a therapist (A.R. at 847, 850, 861, 1104, 1107, 1110, 1113-14, 1117, 1120, 1123-24, 1250).  *See Coren v. Colvin,* 253 F. Supp. 3d 356, 359 (D. Mass. 2017) (daily activities, when consistent with other evidence in the record, can be used to support the ALJ's determination that an opinion is inconsistent with the record as a whole); *see also Dubois v. Astrue,* Civil No. 11-cv-263-JL, 2012 WL 2357258, at *7 (D.N.H. June 20, 2012) (plaintiff's engagement in part-time

---

[5] Plaintiff faults the ALJ for concluding that her "last treatment record was in [December] 2018" and failing to consider Dr. Gallant's treatment record (Dkt. No. 23 at 13).  Because Dr. Gallant's examination was consistent with Plaintiff's other treatment records that showed no more than moderate mental impairments, the ALJ's omission was harmless and remand for that minor omission would be "an empty exercise."  *Ward v. Comm'r of Soc. Sec.,* 211 F.3d 652, 656 (1st Cir. 2000).

work "'cut[] against his claim that he was totally disabled'") (alteration in original) (quoting *Berger v. Astrue,* 516 F.3d 539, 546 (7th Cir. 2008)).  Substantial evidence supported the ALJ's determination that Dr. Hesse's opinion did not deserve controlling weight.

      B.    <u>The ALJ's treatment of Ms. Lutkus' opinions was supported by substantial evidence.</u>

Plaintiff contends that the ALJ erred by failing to consider Plaintiff's Psycho Social Wellbeing Quarterly Scales ("Quarterly Scales") as Ms. Lutkus' medical opinions and failing to give Ms. Lutkus' opinions controlling weight because she was a treating source (Dkt. No. 23 at 10-16; Dkt. No. 33 at 2-3).  Plaintiff's arguments are incorrect as a matter of law.

As a licensed social worker at ServiceNet, Ms. Lutkus was not an "acceptable medical source" listed in the former versions of 20 C.F.R. §§ 404.1513(a) (2016) and 416.913(a) (2016).  *See Andrews,* 2022 WL 867803, at *4 ("a social worker . . . was not an acceptable medical source.").  Consequently, the Quarterly Scales did not meet the regulatory definition of "medical opinions."  *See* 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1); SSR 06-3p, 2006 WL 2329939, at *2 ("only 'acceptable medical sources' can give . . . medical opinions.").  Because Ms. Lutkus was not an "acceptable medical source," she was not a "treating source" and, therefore, her April 2015 letter describing Plaintiff's symptoms and the March 2016 Mental Impairment Questionnaire were not entitled to controlling weight.[6]  *See Taylor,* 899 F. Supp. 2d at 88; SSR 06-03p, 2006 WL 2329939, at *2 ("only 'acceptable medical sources' can be considered treating sources, as defined in 20 C.F.R. [§§] 404.1502 and 416.902, whose medical opinions can be entitled to controlling weight.").

---

[6] Where Ms. Lutkus and Dr. Hesse co-signed the October 2014 opinion, the earlier discussion of the ALJ's explanation for discounting Dr. Hesse's opinion also applies to Ms. Lutkus's October 2014 opinion.

The ALJ adequately explained his reasons for assigning little weight to Ms. Lutkus' opinion that Plaintiff had marked difficulties in maintaining social functioning and concentration, persistence, and pace and had one or two episodes of decompensation within a twelve month period, each of at least two weeks duration (A.R. at 588, 790).[7] *See* SSR 06-3p, 2006 WL 2329939, at *6 (an ALJ "generally should explain the weight given to opinions from . . . 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.").  The ALJ permissibly rejected Ms. Lutkus' opinions that relied on Plaintiff's subjective complaints versus the objective evidence (A.R. at 817).  *See, e.g., Simumba,* 2014 WL 1032609, at *9.

Ms. Lutkus' assessments of Plaintiff's marked limitations in maintaining social functioning and concentration, persistence, and pace conflicted with the previously discussed evidence that supported the ALJ's assessment of moderate limitations in Plaintiff's ability to maintain social functioning and concentration, persistence, and pace:  the treatment providers' mental status examinations; Plaintiff's GAF scores that ranged from 50 to 55; the state agency consultants' mental residual functional capacity assessments; and Plaintiff's activities (A.R. at 817-18).

The ALJ gave good reasons for rejecting Ms. Lutkus' opinion concerning Plaintiff's episodes of decompensation.  Ms. Lutkus' assessment was inconsistent with the treatment

---

[7] The questionnaire described "episodes of decompensation" as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulty in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence or pace.  Episodes of decompensation may be demonstrated by an exacerbation of symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)" (A.R. at 790).

records that reflected the absence of psychosis, hallucinations, delusions, and suicidal or homicidal ideation, no history of hospitalization or inpatient treatment, and Plaintiff's conservative treatment regimen (A.R. at 817-18, 821). *See Lefranc v. Comm'r of Soc. Sec.,* Civ. No. 18-1760 (MDM), 2020 WL 13481989, at *7 (D.P.R. Feb. 11, 2020) (the absence of inpatient admissions to the hospital during the relevant time period supported the ALJ's determination that the plaintiff did not demonstrate repeated episodes of decompensation of an extended duration); *Dacosta v. Berryhill,* Case No. 3:17-cv-30085-KAR, 2019 WL 404039, at *14 (D. Mass. Jan. 31, 2019) (the ALJ was warranted in discounting an opinion about the plaintiff's episodes of decompensation because there was no indication that the plaintiff was hospitalized for her mental impairments for an extended period of time). Contrary to Plaintiff's contention, psychiatric medication and therapy may be considered conservative treatments for mental health issues. *See Lagace v. Saul*, 537 F. Supp. 3d 141, 155 (D. Mass. 2021), *appeal docketed sub nom. Lagace v. Kijakazi,* No. 21-1488 (1st Cir. June 30, 2021).

The ALJ also disagreed with Ms. Lutkus' description of obsessive-compulsive symptoms (A.R. at 588, 789, 818). The ALJ correctly noted that Plaintiff's treatment records did not reflect that diagnosis or objective manifestations of that diagnosis (A.R. at 818). Dr. Hesse found that Plaintiff's thought content was free of internal stimuli, hallucinations, delusions, obsessions, compulsions, and phobias (A.R. at 327, 329, 339, 343, 574, 818).

The ALJ was not required to accept Ms. Lutkus' opinion that Plaintiff would be absent from work more than four days per month which, according to the VE, would preclude all employment (A.R. at 791, 866-67). The question of whether Plaintiff was disabled or unable to work was reserved to the Commissioner. *See Foley v. Astrue,* Civil Action No. 09-10864-RGS, 2010 WL 2507773, at *8 (D. Mass. June 17, 2010) ("the opinion of a treating physician that a

claimant is unable to work is entitled to no deference at all (as it is not a medical opinion).") (citing *Morales–Alejandra v. Med. Card Sys., Inc.,* 486 F.3d 693, 700 n.7 (1st Cir. 2007)); 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).

Plaintiff contends that by comparing the mental status examination results to Dr. Hesse's and Ms. Lutkus' opinions, the ALJ failed to appreciate the Quarterly Scales' ratings that showed that Plaintiff's "mental impairments . . . , by their very nature, wax[d] and wane[d]" and, consequently, those records supported the opinions that Plaintiff's mental impairments were disabling (Dkt. No. 23 at 12-13; Dkt. No. 33 at 3). However, "the issue is not whether there is some evidence in the record supporting the plaintiff's allegations -- there usually is -- but whether substantial evidence supported the ALJ's finding." *Lagace*, 537 F. Supp. 3d at 155 (citing *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987)). Unlike the cases upon which Plaintiff relies, Plaintiff was not diagnosed with bipolar disorder and the ALJ's determination that Plaintiff was consistently alert, oriented x 3, with intact cognition, short-term and long-term memory, and good insight and judgment was well-supported by ServiceNet's and Valley Medical Group's longitudinal treatment records that the ALJ thoroughly reviewed and considered (*see, e.g.,* A.R. at 322-23, 326-29, 338, 342, 352, 356, 385, 389, 573, 654-55, 724, 730, 813-18, 821, 1134, 1138, 1145, 1149, 1170, 1174, 1200, 1226, 1263, 1268-69). The ALJ had discretion to resolve evidentiary conflicts or inconsistencies. *See Pickhover v. Kijakazi,* Civil Action No. 20-11967-FDS, 2022 WL 876944, at *9 (D. Mass. Mar. 24, 2022). Substantial evidence supported the ALJ's finding that Dr. Hesse's and Ms. Lutkus' opinions were

inconsistent with the objective evidence showing that Plaintiff's mental health limitations were moderate and were not disabling (A.R. at 821).[8]

V.    CONCLUSION

Based on the foregoing, Plaintiff's motion for judgment on the pleadings (Dkt. No. 22) is DENIED and the Commissioner's motion to affirm (Dkt. No. 31) is GRANTED.  The clerk is directed to close the case.

It is so ordered.

Date:  September 26, 2022                              /s/ Katherine A. Robertson
                                                      KATHERINE A. ROBERTSON
                                                      U.S. MAGISTRATE JUDGE

---

[8] Without citation to the record, Plaintiff criticizes the ALJ for failing to explain the absence of a functional limitation based on his finding that Plaintiff used a cane (Dkt. No. 23 at 16-17). However, there was no error.  The ALJ specifically found that Plaintiff was frequently documented as ambulating normally with a normal gait and station and that she did not require any assistive device (A.R. at 821).